575 S.E.2d 77

**The STATE, Respondent,**

v.

**Danny THOMPSON, Appellant.**

No. 3584.

Court of Appeals of South Carolina.

Submitted Dec. 10, 2002.
Decided Jan. 6, 2003.

Assistant Appellate Defender Eleanor Duffy Cleary, of Columbia, for Appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Charles H. Richardson, Senior Assistant Attorney General Norman Mark Rapoport; and Solicitor Warren B. Giese, all of Columbia, for Respondent.

ANDERSON, J.:

Danny Thompson was indicted for first degree criminal sexual conduct, kidnapping, and carjacking. A jury convicted Thompson of all three charges. The trial court sentenced him to concurrent thirty year terms of imprisonment for criminal sexual conduct and kidnapping, and a concurrent twenty year term of imprisonment for carjacking. Thompson argues the trial court erred in admitting improper hearsay testimony and in failing to declare a mistrial after evidence of his prior bad acts was improperly introduced. We affirm.[1]

## FACTS/PROCEDURAL BACKGROUND

At approximately 2:30 a.m. on October 8, 1999, the victim parked her Camaro in a lot located on the University of South Carolina's campus. As the victim was exiting her car, a man

---

[1]. We decide this case without oral argument pursuant to Rule 215, SCACR.

approached her, pushed her back inside the car, and jumped in the backseat. The man grabbed the victim by the hair and threatened to kill her if she did not drive him to his destination.

The victim cooperated with the man and drove to a rural area in lower Richland County. The man directed the victim to pull her car over on a dirt road and he raped her. After the sexual assault, the man asked the victim for money. When the victim indicated she did not have any money, the man allowed her to exit the car. The victim, wearing only her skirt and a bra, then "took off" running toward some lights she saw in the distance. She "remembered that there were houses that way." The victim ran to a house on Lykesland Trail to ask for assistance. The residents telephoned 911 and the victim was taken to a hospital. After the victim escaped, the man drove off in her Camaro.

The victim was examined at the hospital pursuant to the protocol for sexual assault victims. Her clothing was taken for evidence and a pelvic examination was performed. The examination revealed vaginal tears and bruising, which are indicative of forcible sexual intercourse. A sexual assault nurse examiner collected vaginal swabs from the victim.

The victim described her assailant to the police as a black male "a little bit shorter than" six feet tall weighing about 160 pounds and wearing dark clothing. She gave a description of her car and the license plate number.

On the morning of the assault, a police officer from the University of South Carolina went to the parking lot where the victim was abducted and discovered that several cars in the lot had been vandalized. The officer noticed a Mitsubishi parked in the lot without a student parking decal. He ran a check of the license plate number and discovered the Mitsubishi had been reported stolen. Lynette Metze, the owner of the Mitsubishi, testified that on October 7, 1999, her friend, Danny Thompson, took her car without permission. Metze stated that, after unsuccessfully attempting to locate either Thompson or her car, she notified the police that Thompson had stolen her car.

Acting on the information obtained from the campus police officer and Metze, the Richland County Sheriff's Department

issued a BOLO notice ("be on the look-out") for Thompson. The police provided a description of the victim's Camaro to the local media. The next morning, the police received an anonymous tip that the victim's Camaro was located on Old Ferry Road in lower Richland County. Officers went to Old Ferry Road and found the victim's Camaro parked in a driveway of an abandoned farm. A bystander, who knew one of the officers, informed the investigators that the man driving the Camaro could be found in a home located about 200 yards from where the car was parked. The Thompson family lived in the home, which was owned by Thompson's father.

The officers went to the home and found Thompson. Thompson's father consented to a search of the house. The officers retrieved a pair of baggy, blue sweat pants that matched the victim's description of her attacker's clothing. The police drove Thompson to the police station.

At the police station, Thompson was read his *Miranda* rights and questioned by Sgt. Lancy Weeks. Thompson signed a statement in which he admitted taking Metze's Mistubishi, abducting the victim, raping her, and taking her car. Thompson informed the officer questioning him that the blue sweat pants retrieved from his home were the same pants he wore when he raped the victim. Additionally, Thompson wrote a letter to the victim apologizing for his actions.

Thompson's palm print was recovered from the exterior of Metze's Mitsubishi, but none of the prints found in the victim's Camaro belonged to Thompson. The police found Metze's car keys inside the victim's car. The victim's wallet, which contained the driver's license of the owner of one of the cars broken into on the campus parking lot, was discovered on Air Base Road where Thompson told police he had driven the victim's car.

The victim was unable to identify Thompson in a photo lineup that was presented to her. However, the victim testified that she did not look directly at her attacker during the assault because she was afraid he might hurt her if he thought she could recognize him.

At trial, a forensic expert declared that Thompson's DNA matched the DNA obtained from the vaginal swabs taken from the victim and the semen found on her underwear. The

expert further opined that only one in thirty-two quadrillion persons have the same genetic marker as Thompson.

The jury found Thompson guilty of first degree criminal sexual conduct, kidnapping, and carjacking.

## *LAW/ANALYSIS*

### I. Hearsay/Bystander Statement

■ Thompson contends the trial court erred in admitting the police officers' testimony about the bystander who told them that the person driving the Camaro lived in the Thompsons' home. Thompson alleges this testimony was inadmissible hearsay and, "even if it were not hearsay, it was an improper reference to [Thompson's] character and its prejudicial effect outweighed its probative value." We disagree.

At trial, Deputy Thomas Vail, with the Richland County Sheriff's Department, testified an anonymous citizen reported that the victim's Camaro was on Old Ferry Road. He further stated that when he and Sergeant Bruce Scott arrived at the scene, they found the car. Thereafter, the Solicitor asked Deputy Vail if he received any other information while at the scene. Over Thompson's hearsay objection, Deputy Vail declared:

> While we were out with the vehicle, Sergeant Scott and myself—Sergeant Scott saw an individual that he knew from personal—personally. This individual who lives out in that area said, as I recall, he said, told Sergeant Scott, the guy who was driving that car is over there and he pointed to a house just at the intersection of Old Ferry and Congaree Road.

According to Sergeant Scott, the bystander told him that "the person that we were looking for that was the [sic] driving the Camaro lived on Congaree Road and he actually pointed to the mobile home." Scott testified the bystander told him that he did not want to be identified.

Thompson objected to the testimony of both Vail and Scott regarding the bystander. He claimed the testimony was hearsay. Thompson maintained he needed the opportunity to cross-examine the bystander because the bystander directly implicated Thompson as the driver of the victim's car. The

trial court overruled Thompson's objection, concluding that the officers' testimony regarding the bystander was not offered to prove the truth of the matter asserted but rather to explain the officers' reasoning for going to the Thompson home.

A leading case in South Carolina in regard to evidence offered for the purpose of explaining why a government investigation was undertaken is *State v. Brown*, 317 S.C. 55, 451 S.E.2d 888 (1994). *Brown* edifies:

> Brown argues the trial judge erred in failing to direct a mistrial after two police officers' statements were admitted. Brown claims the officers' statements about receiving information before establishing a surveillance, receiving complaints while in the neighborhood, and being "familiar with" the neighborhood were hearsay.
>
> Evidence is not hearsay unless it is an out of court statement offered to prove the truth of the matter asserted. *State v. Sims*, 304 S.C. 409, 405 S.E.2d 377 (1991), *cert. denied*, 502 U.S. 1103, 112 S.Ct. 1193, 117 L.Ed.2d 434 (1992). Additionally, an out of court statement is not hearsay if it is offered for the limited purpose of explaining why a government investigation was undertaken. *United States v. Love*, 767 F.2d 1052 (1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 849, 88 L.Ed.2d 890 (1986). Here, these statements were not entered for their truth but rather to explain why the officers began their surveillance. These statements are not hearsay and, therefore, the trial judge committed no error in allowing these statements into evidence.

*Brown*, 317 S.C. at 63, 451 S.E.2d at 893–94. Evidence explaining why law enforcement is in a particular area has been held to be relevant information for the jury to consider. *State v. Johnson*, 318 S.C. 194, 456 S.E.2d 442 (Ct.App.1995); *State v. Davis*, 309 S.C. 56, 419 S.E.2d 820 (Ct.App.1992).

The case of *Rhodes v. State*, 349 S.C. 25, 561 S.E.2d 606 (2002), is instructive. *Rhodes* involves testimony from the victim's friend that he gave the victim a middle school yearbook with the defendant's picture in it because the friend had heard rumors that the defendant was involved in shooting "a guy and a girl." The *Rhodes* court determined:

We find that the testimony admitted in this case about Thompson hearing petitioner was the shooter does not constitute hearsay. The rule against hearsay prohibits the admission of an out-of-court statement to prove the truth of the matter asserted. *E.g., Dawkins v. State,* 346 S.C. 151, 551 S.E.2d 260 (2001). Here, it was repeatedly made clear during trial that the information Thompson had heard was "from the street," i.e., a "rumor." It was not offered to prove that petitioner had committed the crimes, but rather to explain Cook's identification of petitioner in the yearbook. This in turn led to petitioner's apprehension and the subsequent identification of him by both victims via the photographic line-up.

*Rhodes,* 349 S.C. at 31, 561 S.E.2d at 609 (footnote omitted).

In the instant case, the officers' testimony regarding statements made by the bystander were not entered for their truth but rather to explain and outline the officers' investigation and their reasons for going to the Thompsons' home. Thus, the evidence was not hearsay and was properly before the trial court. *See Caprood v. State,* 338 S.C. 103, 111, 525 S.E.2d 514, 518 (2000) (finding statements made regarding unrelated crimes not hearsay where "officers were explaining their actions in pursuing the defendants and the statements were not offered for their truth"); *State v. Kirby,* 325 S.C. 390, 396, 481 S.E.2d 150, 153 (Ct.App.1996) (concluding testimony by police officer about dispatcher's call was not hearsay where offered to explain "the reason for the initiation of police surveillance of the vehicle in question"); *State v. Johnson,* 318 S.C. 194, 197, 456 S.E.2d 442, 444 (Ct.App.1995) (ruling testimony that defendant was in a "high drug traffic area" was not hearsay because it was introduced as "background information" about the investigation). *Cf. German v. State,* 325 S.C. 25, 478 S.E.2d 687 (1996) (determining, in context of postconviction claim of ineffective assistance of counsel, that undercover drug agent's testimony that he had tips that defendant was distributing drugs and that he had been given description of defendant that would make him easily identifiable was not admissible to explain why police first stopped defendant, and testimony was objectionable; noting that, while *State v. Brown, supra,* allowed general statements referring to drug activity in an apartment complex in which a defendant

lived, agent's testimony in *German* specifically referred to defendant and his character).

## II. Mistrial

■ Thompson argues the trial court erred in failing to declare a mistrial based on Deputy Vail's testimony concerning warrants against Thompson. Thompson contends the reference to the warrants "constituted improper evidence of prior bad acts." We disagree.

The Solicitor questioned Vail regarding what he and Scott were trying to ascertain when they approached the Thompsons' home. Vail responded: "We were trying to ascertain if the suspect, the defendant at the time that we knew had warrants, Mr. Thompson, if he was actually at the residence or not."

■ The decision to grant or deny a mistrial is within the sound discretion of the trial judge. *State v. Cooper*, 334 S.C. 540, 514 S.E.2d 584 (1999); *State v. Simmons*, No. 3572, 352 S.C. 342, 573 S.E.2d 856 (Ct.App.2002) ; *State v. Patterson*, 337 S.C. 215, 522 S.E.2d 845 (Ct.App.1999). The court's decision will not be overturned on appeal absent an abuse of discretion amounting to an error of law. *State v. Harris*, 340 S.C. 59, 530 S.E.2d 626 (2000); *State v. Kelsey*, 331 S.C. 50, 502 S.E.2d 63 (1998); *see also State v. Arnold*, 266 S.C. 153, 157, 221 S.E.2d 867, 868 (1976) (the general rule of this State is that "the ordering of, or refusal of a motion for mistrial is within the discretion of the trial judge and such discretion will not be overturned in the absence of abuse thereof amounting to an error of law.").

■ "The power of a court to declare a mistrial ought to be used with the greatest caution under urgent circumstances, and for very plain and obvious causes" stated into the record by the trial judge. *State v. Kirby*, 269 S.C. 25, 28, 236 S.E.2d 33, 34 (1977); *see also State v. Beckham*, 334 S.C. 302, 513 S.E.2d 606 (1999) (granting of motion for mistrial is extreme measure which should be taken only where incident is so grievous that prejudicial effect can be removed in no other way); *Patterson*, 337 S.C. at 227, 522 S.E.2d at 851 (mistrial should only be granted in cases of manifest necessity and with the greatest caution for very plain and obvious reasons). A

mistrial should only be granted when "absolutely necessary," and a defendant must show both error and resulting prejudice in order to be entitled to a mistrial. *Harris*, 340 S.C. at 63, 530 S.E.2d at 628; *see also State v. Council*, 335 S.C. 1, 515 S.E.2d 508 (1999) (mistrial should not be granted unless absolutely necessary; to receive mistrial, defendant must show error and resulting prejudice). "The less than lucid test is therefore declared to be whether the mistrial was dictated by manifest necessity or the ends of public justice." *State v. Prince*, 279 S.C. 30, 33, 301 S.E.2d 471, 472 (1983).

We find that Deputy Vail's single reference to warrants that existed against Thompson did not constitute sufficient prejudice to justify a mistrial. As an initial matter, there is no indication from Deputy Vail's testimony that the warrants referred to unrelated charges or other bad acts committed by Thompson. Prior to the testimony concerning the warrants, the jury heard testimony that a BOLO had been issued against Thompson based on the suspicion that he had been involved in the attack of the victim. Thus, it would be reasonable to assume the jury inferred that the warrants related to the charged offenses. Additionally, a vague reference to a defendant's prior criminal record is not sufficient to justify a mistrial where there is no attempt by the State to introduce evidence that the accused has been convicted of other crimes. *See State v. Council*, 335 S.C. 1, 515 S.E.2d 508 (1999) (determining law enforcement agent's isolated testimony that he compared defendant's fingerprints with fingerprint card agency had on record was not so prejudicial to defendant as to warrant mistrial because it was questionable whether jury drew connection between fingerprint card and defendant's prior criminal activity); *State v. George*, 323 S.C. 496, 476 S.E.2d 903 (1996) (recognizing appellant's possible drug dealing was merely suggested and no testimony was presented concerning such behavior); *State v. Singleton*, 284 S.C. 388, 326 S.E.2d 153 (1985), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991) (noting that references to defendant's prior crimes in arresting officer's testimony that he told defendant that he was under arrest for escape and murder and that he asked defendant where correctional truck was were extremely vague); *State v. Robinson*, 238 S.C. 140, 119 S.E.2d 671 (1961), *overruled on other*

*grounds by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991) (Court emphasizing that, even if the testimony created the inference in the jury's mind that the accused had committed another crime, the State never attempted to prove the accused had been convicted of some other crime).

## III. Harmless Error

■ Finally, considering the overwhelming evidence of Thompson's guilt, any possible error that resulted in the introduction of the alleged hearsay evidence and the testimony concerning the warrants was harmless.

■ Whether an error is harmless depends on the circumstances of the particular case. *State v. Taylor,* 333 S.C. 159, 508 S.E.2d 870 (1998); *State v. Reeves,* 301 S.C. 191, 391 S.E.2d 241 (1990). "No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case." *State v. Mitchell,* 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985). Error is harmless when it could not reasonably have affected the result of the trial. *Mitchell,* 286 S.C. at 573, 336 S.E.2d at 151; *State v. Key,* 256 S.C. 90, 180 S.E.2d 888 (1971). Where a review of the entire record establishes the error is harmless beyond a reasonable doubt, the conviction should not be reversed. *State v. Pickens,* 320 S.C. 528, 466 S.E.2d 364 (1996); *State v. King,* 349 S.C. 142, 561 S.E.2d 640 (Ct.App.2002).

Here, the victim's car was located near Thompson's home. Moreover, Thompson confessed to raping and abducting the victim, as well as taking her car; he identified the clothes seized from his home as the ones he wore when he raped the victim; and he wrote the victim a letter apologizing for his actions. Additionally, keys from the car Thompson took from Metze were found inside the victim's car. Furthermore, forensic evidence established that Thompson's DNA matched the DNA obtained from the vaginal swabs taken from the victim and semen found in the victim's clothing. Thus, there was overwhelming evidence indicating Thompson's guilt, and any perceived error from the officers' testimony was harmless.

## *CONCLUSION*

Accordingly, Thompson's convictions are **AFFIRMED.**

HEARN, C.J., and CURETON, J., concur.